## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DANIEL DIMARCELLA | : | |
| 8 Hilltop Rd. | : | |
| Plymouth Meeting, PA 19462 | : | |
| | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | No.: |
| v. | : | |
| | : | |
| VALLEY FORGE | : | |
| MILITARY ACADEMY | : | **JURY TRIAL DEMANDED** |
| 1001 Eagle Rd. | : | |
| Wayne, PA 19087 | : | |
| | : | |
| Defendant. | : | |

## CIVIL ACTION COMPLAINT

Plaintiff, Daniel DiMarcella (*hereinafter* referred to as "Plaintiff"), by and through his undersigned counsel, hereby avers as follows:

### I.   Introduction

1.      Plaintiff has initiated this action to redress violations by Defendant of Title VII of the Americans with Disabilities Act, as amended ("ADA" - 42 USC §§ 12101 *et. seq.*) and the Pennsylvania Human Relations Act ("PHRA").[1] Plaintiff asserts that Defendant unlawfully terminated his employment in violation of these laws and that he suffered damages as sought herein.

---

[1] Plaintiff will move to amend his instant lawsuit to include claims under the Pennsylvania Human Relations Act ("PHRA" - 43 P.S. §§ 951 *et. seq.*) once his administrative remedies are fully exhausted with the Pennsylvania Human Relations Commission with respect to such claims. Any claims under the PHRA would mirror Plaintiff's instant ADA claims as detailed herein (although there are some differences in damage entitlements under such laws).

## II.  Jurisdiction and Venue

2.      This Court may properly maintain jurisdiction over Defendant because Defendant's contacts with this state and this judicial district are sufficient for the exercise of jurisdiction over Defendant to comply with traditional notions of fair play and substantial justice, satisfying the standard set forth by the United States Supreme Court in International Shoe Co v. State of Washington, 326 U.S. 310 (1945) and its progeny.

3.      This action is initiated pursuant to a federal law.  The United States District Court for the Eastern District of Pennsylvania has original subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the claims arise under the laws of the United States.  This Court has supplemental jurisdiction over Plaintiff's state-law claims because they arise out of the same circumstances and are based upon a common nucleus of operative fact.

4.      Venue is properly laid in this District pursuant to 28 U.S.C. §§ 1391(b)(1) and (b)(2), because Defendant resides in and/or conducts business in this judicial district and because a substantial part of the acts and/or omissions giving rise to the claims set forth herein occurred in this judicial district.

5.      Plaintiff is proceeding herein under the ADA, and has properly exhausted his administrative remedies (with respect to his ADA claims) by timely filing a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and by filing the instant lawsuit within ninety (90) days of receiving a notice of dismissal and/or right to sue letter from the EEOC.

## III. Parties

6.      The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

7.      Plaintiff is an adult male who resides at the above-captioned address.

8.      Defendant Valley Forge Military Academy (hereinafter "Defendant") is a non-profit preparatory boarding institution located at the above-captioned address.

9.      At all times relevant herein, Defendant acted by and through their agents, servants, and employees, each of whom acted at all times relevant herein in the course and scope of their employment with and for the benefit of Defendant.

## IV.   Factual Background

10.     The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

11.     In or about August of 2011, Plaintiff was hired by Defendant as a part-time employee.

12.     As a result of his stellar performance, Plaintiff was promoted to the position of a full-time chemistry teacher within Defendant in or about November of 2011.

13.     Plaintiff remained in the position of a full-time Chemistry teacher for the remainder of the 2011/2012 school year and was praised in his year-end review.

14.     At the end of the 2011/2012 school year, Plaintiff was offered a new contract for the 2012/2013 school year.

15.     From in or about September of 2012 until in or about May of 2013, Plaintiff continued to be praised for his performance and was even recruited to serve in mentor and host-teacher programs within Defendant.

16.     In or about May of 2013, Plaintiff was a victim of a break-in of his classroom, wherein three cadets broke into his classroom with a weapon in an attempt to retrieve one of the cadet's cellular phones that Plaintiff had confiscated earlier that day.

17.    Prior to being hired with Defendant, Plaintiff was a victim of an assault at one of his previous employers, when he was stabbed by a student from behind. As a result of this incident, Plaintiff began to suffer from anxiety and Post Traumatic Stress Disorder.

18.    While employed with Defendant from August of 2011 through May of 2013, Plaintiff was able to keep his aforementioned health conditions under control; however, as a result of the break-in of his classroom in or about May of 2013, the symptoms of Plaintiff's disabilities became exacerbated and Plaintiff started to suffer from flare-ups of his PTSD and anxiety.

19.    On or about May 22, 2013, Plaintiff sent an e-mail to one, Jeff Brown ("Brown'), Defendant's Headmaster, apprising him of his aforementioned disabilities and informing him that due to the recent events that occurred within Defendant (referencing the break-in of his class room) his symptoms of PTSD were resurfacing.

20.    Plaintiff further informed Brown in his May 22, 2013 e-mail that since the break-in of his classroom, he was been subjected to other events which were causing him to have flare-ups of his PTSD. For example, Plaintiff explained to Brown that since the three cadets broke into his classroom, the incident was never properly addressed, which allowed the one cadet to continue to confront Plaintiff. Plaintiff further asked for Brown's "help and understanding" regarding his health conditions.

21.    On or about May 29, 2013, Plaintiff had not heard any response from his e-mail sent to Brown on May 22, 2013; therefore, Plaintiff attempted to follow up with Brown in person. Plaintiff visited Brown's office and asked him if they could speak about the aforementioned e-mail regarding his disability; Brown responded to Plaintiff's request by stating that he read it but was "too busy to address it" with him.

4

22.     Throughout the summer of 2013, Brown never spoke with Plaintiff regarding his disability or his May 22, 2013 e-mail.

23.     In or about July of 2013, Plaintiff was informed by Brown that he was being demoted from his position as a chemistry teacher, moved from his classroom, and reassigned to a position wherein he was requested to instruct 5 different science disciplines, including disciplines which he had no prior experience teaching.

24.     Defendant had demoted Plaintiff, despite the fact that he had spent the entire summer updating the chemistry curriculum for the 2013/2014 school year and was heavily involved in rebuilding the chemistry lab to make it safe and functional for the students.

25.     Plaintiff e-mailed Brown on July 28, 2013 requesting that he be given his job back as a chemistry teacher; however, Plaintiff's e-mail was ignored (despite the fact that Brown had informed Plaintiff that he had received such e-mail).

26.     On or about August 18, 2013, Plaintiff sent another e-mail to Brown and Marianne Meade ("Meade"), Plaintiff's Human Resources Director.

27.     In Plaintiff's August 18, 2013 e-mail, Plaintiff expressed concerns of mistreatment by Defendant's management related to his disability and informed Defendant that "the current situation" (referring to his demotion and eviction from his classroom) has "been disastrous for [his] disability."

28.     On or about August 20, 2013, Brown responded to Plaintiff's August 18, 2013 e-mail suggesting that he unaware of Plaintiff's disability (even though he had previously admitted to Plaintiff that he had received Plaintiff's May 22, 2013 wherein he apprised Brown of his disability) and berated him with questions about his disability.

5

29.     On August 22, 2013, Plaintiff sent another e-mail to Brown informing him that due to his aforementioned disabilities and the recent events of being demoted and evicted from his classroom, his symptoms were growing worse. Specifically, Plaintiff mentioned that he had been diagnosed with Fibromyalgia and when he has flare-ups with his PTSD, it triggers his Fibromyalgia, making it difficult for him to walk and write (as he would be in severe pain).

30.     In Plaintiff's August 22, 2013 e-mail, he requested to be excused from study hall until he could control his symptoms so he would not be "mobile in pain." Study Hall was also very chaotic and exacerbated Plaintiff's symptoms of PTSD.

31.     While Brown informed Plaintiff that he was going to forward his request to Meade, Plaintiff did not received a response from Defendant's management about his aforementioned accommodation requests.

32.     Thus, on August 30, 2013, Plaintiff sent a formal request for an accommodation to Brown indicating that he was requesting "work time flexibility" which would allow him to "come in earlier and leave earlier when [he did] not have scheduled instructional class" and an "alternative assignment . . . in lieu of barrack study hall"[2] as the "confinement" and "walking distance" would cause him "extreme discomfort and pain."

33.     On September 3, 2013, Brown informed Plaintiff via e-mail that he would send his aforementioned requests for accommodations to Meade.

34.     Plaintiff responded to Brown's September 3, 2013 e-mail asking Defendant to provide him with documentation that was within the guidelines of the ADA so that his doctor could submit the necessary medical information to support his requests for accommodations.

---

[2] Plaintiff was only requested to do Barrak Study Hall two times per month and such Study Halls lasted approximately two hours.

Plaintiff further complained to Brown about the discriminatory treatment that he was receiving from Defendant as a result of his disability.

35.     Brown did not respond to Plaintiff's September 3, 2013 complaint of discrimination.

36.     Because Defendant still had not responded to Plaintiff's September 3, 2013 request for a form that his doctor could complete to further support his requests for accommodations, Plaintiff obtained a "Medical Inquiry Form to Support Reasonable Accommodations" from the Department of Labor and submitted it to Defendant.

37.     On or about September 17, 2013, Plaintiff was called into a meeting with Meade and Brown, wherein Plaintiff was again berated with questions about his disability and personal life.

38.     In the September 17, 2013 meeting between Plaintiff, Brown, and Meade, Plaintiff was informed by Meade that his Medical Inquiry Form to Support Reasonable Accommodations was unacceptable to her. When Plaintiff tried to explain why he believed such form was in line with the ADA guidelines, Meade responded by telling Plaintiff "I don't care what the ADA says" and that such form was still unacceptable.

39.     The September 17, 2013 meeting was concluded by Meade informing Plaintiff that he needed to complete an FMLA form in order for Defendant to consider his reasonable accommodation request. When Plaintiff questioned Defendant's need for him to fill out an FMLA form (since he never requested FMLA leave or represented that he was unable to work), Meade responded by saying "that is the form you need to fill out and when you're done filling out the DOL form we will schedule another meeting."

40.     On September 19, 2013, Plaintiff sent an e-mail to Meade explaining that his doctor thought that a form more specific to the ADA would be better suited for what Plaintiff was requesting (rather than the FMLA form Meade had given Plaintiff earlier) and attached a linked suggesting another form.

41.     Meade responded to Plaintiff's September 19, 2013 e-mail demanding that Plaintiff have the form that she gave him (the FMLA form) completed and returned.

42.     Plaintiff's doctor would not fill out the FMLA form, as Plaintiff had not requested FMLA leave; therefore, Plaintiff sent another e-mail to Meade on September 24, 2013 stating that he was not "looking for FMLA," that he was just looking for reasonable accommodations, and that the form that he already provided to her (as discussed *supra*) should explain why he needed such accommodations.

43.     Meade responded to Plaintiff's September 24, 2013 e-mail by stating "[t]he form you have submitted is not accepted" and requested that he fill out the "DOL form" (referring to the FMLA form).

44.     On or about September 27, 2013, Plaintiff informed Meade once again that he was not requesting leave without pay but rather a reasonable accommodation under the ADA and expressed his concern about Defendant's discriminatory treatment as it related to his aforementioned disabilities and requests for accommodations.

45.     Meade responded to Plaintiff's September 27, 2013 e-mail denying his accommodation requests and informing him that the only way Defendant would reconsider his requests for accommodations is if Plaintiff had the FMLA form completed and submitted, thus denying Plaintiff's requests without engaging in any interactive process.

46.     Defendant's management was literally forcing Plaintiff to request FMLA leave (which he did not need or want as part of his requested accommodations) before they would engaged in any interactive process with Plaintiff.

47.     On or about October 9, 2013 Plaintiff sent an e-mail to Meade and Brown requesting that they "cease in discriminatory activity and dialogue towards [him], and allow [him] to enjoy work equal to those who do not have disabilities."

48.     From October 9, 2013 through October 16, 2013, Plaintiff continued to make his aforementioned accommodation requests and express concerns of disability discrimination and retaliation.

49.     On or about October 16, 2013, Meade also informed Plaintiff that he could temporarily work from home after his last scheduled class on Tuesdays subject to "getting more information and detail from [Plaintiff] and [his] medical provider about [his] disability." Meade again requested that Plaintiff fill out the FMLA form that she had previously provided to him because Defendant's management "need[ed] more information from [him] and [his] doctor to be able to think through [his] requests."

50.     Plaintiff responded to Meade's October 16, 2013 e-mail by telling her that he would attempt to get his doctor to follow Defendant's instructions to fill out the FMLA form but that he feels Defendants actions had made "the work environment very difficult" and asked again for "compassion and understanding."

51.     On or about October 21, 2013, Meade e-mailed Plaintiff berating him about the alleged lack of information that his doctor had provided regarding his disabilities and accommodations requests.

52.     On or about October 21, 2013, Meade also requested several things from Plaintiff including (1) to "have [his] doctor complete the DOL form provided to [him], and return [it] to [her] ASAP;" (2) to "detail, in writing, to [her] the specific accommodations [he was] currently requesting, by this Wednesday" (despite the fact that he had already done so on August 30, 2013); (3) and plan a meeting with her and Jeff [Brown] the following week. Meade also told Plaintiff to take a copy "of all the recent e-mails on this issue, talk to the attorney [he was] working with, and have [his] attorney advise the Academy's counsel, in writing, of the reasons why [he] will not complete the DOL leave form."

53.     As of October 21, 2013, Plaintiff had not obtained an attorney and Defendant's management's false assumption that he had is just evidence that Defendant was clearly worried that Plaintiff was going to take legal action against Defendant for their clear violations of the ADA.

54.     Meade's October 21, 2013 hostile e-mail was followed by more animosity from Defendant's management, including by not limited to questioning Plaintiff about his emergency lesson plans (which were never an issue until after Plaintiff requested accommodations and complained of disability discrimination).

55.     On or about November 4, 2013, Plaintiff returned the FMLA forms to Meade and Brown which provided very detailed information about Plaintiff's disabilities and need for accommodations; however, Plaintiff black-lined the language on such forms which would indicate that he was requesting FMLA leave (as he was not).

56.     Meade responded to Plaintiff's aforementioned submission of such FMLA forms by informing Plaintiff that he did not return the materials that Defendant was requesting he complete and that "to ensure that the Academy has a clear understanding of how [to] support

[his] request for accommodation [he] will need to complete the DOL/FMLA form [she] previously supplied [him] on 9/17/13."

57.     Plaintiff had supplied Defendant's management with more than sufficient information for them to make a determination as to whether they could accommodate Plaintiff's aforementioned disabilities; however, Defendant still refused to accept Plaintiff's documentation and continued to attempt to force Plaintiff to request FMLA (even though Plaintiff had never represented that he could not work as a result of his disabilities).

58.     On or about November 6, 2013, Plaintiff was called into a meeting with Meade and Brown, which Meade informed Plaintiff would be an "interactive" meeting.

59.     However, when Plaintiff arrived at the November 6, 2013 meeting, he was met with hostility and aggression by both Meade and Brown and was probed with numerous questions about his disability (including but not limited to questions about his medical past – unrelated to his aforementioned disabilities).

60.     When Plaintiff informed Meade and Brown that he was feeling uncomfortable and becoming symptomatic (with regards to his PTSD symptoms), Meade laughed at Plaintiff.

61.     At no point in time during Plaintiff's November 6, 2013 meeting was there any mentioned of Plaintiff's reasonable accommodations requests (despite the fact that Meade informed Plaintiff that it would be an "interactive" meeting).

62.     Because of Brown's and Meade's aggressive behavior, Plaintiff requested to be excused from the November 6, 2013 meeting, as he began to suffer from symptoms of his PTSD (including but not limited to having a anxiety attack); however, Brown and Meade ignored Plaintiff's requests.

63.     Because Plaintiff was concerned for his health, Plaintiff excused himself from the November 6, 2013 meeting.

64.     Brown reprimanded Plaintiff for leaving the November 6, 2013 meeting, told him that such behavior was unacceptable, and requested a meeting with him the next day.

65.     Plaintiff responded to Brown's request to meet with him the next day by stating that because of the hostility that he was subjected to during the November 6, 2013 meeting, he was requesting to have a consultant from the Job Action Network "a service of the Office of Disability Employment Policy, U.S. Department of Labor" to mediate the meeting scheduled for the next day.

66.     Plaintiff's aforementioned request to have a consultant mediate the meeting scheduled for the next day was denied by Defendant's management.

67.     On or about November 6, 2013 (after Plaintiff's aforementioned meeting), Meade sent Plaintiff an e-mail stating that his behavior during the meeting "was unprofessional, insubordinate, and will not be tolerated." At no point in time was Plaintiff unprofessional or insubordinate during the November 6, 2013 meeting.

68.     Meade further stated in her November 6, 2013 e-mail that the FMLA forms Plaintiff submitted were "vague and did not provide necessary detail." To the contrary, the forms that Plaintiff provided were very detailed and gave Defendant's management more than enough information about his disabilities and limitations to allow them to engage in the interactive process with Plaintiff.

69.     Regardless of the fact that Plaintiff supplied two different forms with detailed information about his disabilities and limitations, Defendant's management still refused to

engage in the interactive process with Plaintiff to determine if they could accommodate his disabilities.

70.     Had Defendant engaged in the interactive process to determine if Plaintiff's disabilities could be accommodated, they could have easily determined (*inter alia*) if:

      a. Plaintiff could have sat outside the barracks during evening study hall (and had the students come to him if they had questions);

      b. Plaintiff could have performed work other than evening study hall;

      c. Plaintiff could have switch duties with another employee to avoid evening study hall;

      d. Policies could have been put in place to make evening study hall less chaotic (thus making it less likely for Plaintiff to suffer from symptoms of PTSD during study hall); and

      e. Plaintiff could have come into work earlier and leave earlier when he did not have scheduled instructional classes (time flexibility).

71.     When Plaintiff arrived at a meeting with Brown and Meade on November 7, 2013 meeting, Meade and Brown began by making false accusations about Plaintiff and once again berated him with questions completely unrelated to his requested accommodations (including questions about his personal history).

72.     When Plaintiff informed Meade and Brown during their November 7, 2013 meeting that their hostility and aggressive actions towards him were making his disability symptoms flare-up and that he thought it would be best to excuse himself from the meeting (for his health and safety), Meade began to mock Plaintiff and question his need to be excused.

73.     Because Plaintiff's PTSD symptoms were being aggravated by Meade's and Brown's aggressive behavior, Plaintiff again had to excuse himself from the November 7, 2013 meeting.

74.     On or about November 8, 2013, Plaintiff was informed that he was being suspended with pay because he left the November 7, 2013 meeting without permission (because of his health conditions).

75.     On or about November 15, 2013, Plaintiff was scheduled to meet with Brown and Meade; however, Plaintiff informed Meade that he was unable to do so because of medical reasons (a dentist appointment).

76.     Meade informed Plaintiff that he would need to supply a doctor's note by November 18, 2013 at 9:00 a.m. regarding his inability to meet with them[3] on November 15, 2013. Meade also informed Plaintiff that he would need to meet with her and Brown on November 18, 2013 or Defendant would have to consider terminating Plaintiff's employment.

77.     Plaintiff informed Meade that he would not be able to attend a meeting with them on November 18, 2013 due to medical reasons related to his disability.

78.     Because Plaintiff's dentist's office was not open until after 9:00 a.m., Plaintiff had his dentist fax the note to Defendant as early as possible on November 18, 2013 to excuse his absence from the November 15, 2013 meeting.

79.     On or about November 25, 2013, Plaintiff was terminated from his employment with Defendant.

80.     In Plaintiff's termination letter, Defendant lists multiple reasons for terminating Plaintiff's employment including but not limited to minor events that happened months prior to Plaintiff's termination (for which he was never disciplined for) and for failing to respond to Defendant's alleged requests made on November 21, 2013 and November 24, 2013 for him to

---

[3] Defendant's Employee Handbook does not require employees to submit a doctor's note when missing a school day for medical reasons; however, Plaintiff was demanded to do so on November 15, 2013.

contact Brown and schedule a time to meet with him on November 24, 2014 or November 25, 2013 (requests which Plaintiff never received).

81.     In Plaintiff's termination letter, Defendant also makes reference to an omission made by Plaintiff on his employment application regarding a prior employer. However, Defendant has no legitimate business reason for scouring through Plaintiff's entire personnel file (including a resume that he submitted nearly three years prior) in an attempt to find reasons to terminate Plaintiff.

82.     Plaintiff had left his prior employer off his resume, as discussion about why he left such school would have brought up his disability and thus discussion about his experience being stabbed, which could have exacerbated his PTSD symptoms.

83.     Plaintiff's termination was completely and utterly pretextual, as Plaintiff was terminated (1) shortly after informing Defendant's management of the nature of his disabilities and requesting accommodations for such disabilities; (2) in extremely close proximity to his last complaint of disability discrimination to Defendant's management; (3) after being subjected to constant ridicule and harassment after requesting accommodations for his disabilities; (4) after Defendant attempted to force him to take FMLA leave (even though he never informed Defendant that he was unable to work); (5) for minor events that happened months prior to Plaintiff's termination, which he was never disciplined for; and (6) for a multitude of other reasons, including reasons that are completely false and made up to cover Defendant's clear violations of the ADA.

**Count I**
**Violations of the Americans With Disabilities Act ("ADA," as amended)**
**(Disability Discrimination, Retaliation, & Failure to Accommodate)**

84.     The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

85.     Plaintiff has and continues to suffer from qualifying disabilities under the ADA because he has PTSD which causes him to have anxiety, limits his ability to sleep, engage in social interaction, and focus. Plaintiff also suffers from Fibromyalgia which affects his ability to walk and write when his PTSD is exacerbated.[4]

86.     Plaintiff asked for reasonable accommodations for his aforementioned disabilities, which Defendant refused to provide unless Plaintiff submitted FMLA forms (even though Plaintiff never represented that he could not work and never informed management that he needed or wanted FMLA leave).

87.     Despite the fact that Plaintiff had requested accommodations (as discussed *supra*) on multiple occasions and submitted two different forms detailing his disabilities, limitations, and need for accommodations, Defendant still refused to engage in the interactive process with Plaintiff and instead continued to harass him.

88.     Plaintiff complained on multiple occasions of Defendant's discriminatory treatment of him as it related to his disabilities and requests for accommodations (the last complaint which was made within days of his termination).

89.     Plaintiff believes and therefore avers that he was terminated by Defendant because of his: (1) record of impairment; (2) known or perceived health problems; (3) requests reasonable accommodations; and/or (4) complaints of disability discrimination.

---

[4] The life activities specified herein are for example only and are not intended to be an exclusive list of life activities impacted by Plaintiff's health conditions.

90.     Plaintiff also believes and therefore avers that Defendant refused to engage in the interactive process with Plaintiff (as required by the ADA) and failed to accommodate his disabilities.

91.     These actions as aforesaid constitute violations of the ADAAA.

**WHEREFORE**, Plaintiff prays that this Court enter an order providing that:

A.     Defendant is to be prohibited from continuing to maintain its illegal policy, practice, or custom of discriminating/retaliating against employees based on their medical needs and are to be ordered to promulgate an effective policy against such discrimination and to adhere thereto;

B.     Defendant is to compensate Plaintiff, reimburse Plaintiff, and make Plaintiff whole for any and all pay and benefits Plaintiff would have received had it not been for Defendant's illegal actions, including but not limited to back pay, front pay, bonuses and medical and other benefits.  Plaintiff should be accorded those benefits illegally withheld from the date she first suffered discrimination/retaliation at the hands of Defendant until the date of verdict;

C.     Plaintiff is to be awarded liquidated or punitive damages as permitted by applicable law in an amount believed by the Court or trier of fact to be appropriate to punish Defendant for its willful, deliberate, malicious and outrageous conduct, and to deter Defendants from engaging in such misconduct in the future;

D.     Plaintiff is to be accorded any and all other equitable and legal relief as the Court deems just, proper, and appropriate (including but not limited to damages for emotional distress / pain and suffering - where legally permitted);

E.     Plaintiff is to be awarded the costs and expenses of this action and reasonable legal fees as provided by applicable federal and state law;

F.      Any verdict in favor of Plaintiff is to be molded by the Court to maximize the financial recovery available to Plaintiff in light of the caps on certain damages set forth in applicable federal law;

G.      Plaintiff's claims are to receive a trial by jury to the extent allowed by applicable law.  Plaintiff has also endorsed this demand on the caption of this Complaint in accordance with Federal Rule of Civil Procedure 38(b).

                                   Respectfully submitted,

                                   **KARPF, KARPF & CERUTTI, P.C.**

                    By:    _____
                                   Ari R. Karpf, Esq.
                                   Katie A. Pilgren-Beatty, Esq.
                                   3331 Street Road
                                   Two Greenwood Square, Suite 128
                                   Bensalem, PA 19020
                                   (215) 639-0801

Dated: September 9, 2014

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

### CASE MANAGEMENT TRACK DESIGNATION FORM

| | | |
|---|---|---|
| Daniel DiMarcella | : | CIVIL ACTION |
| v. | : | |
| Valley Forge Military Academy | : | NO. |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.)  In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

### SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.                    ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
and Human Services denying plaintiff Social Security Benefits.                    ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.   ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from
exposure to asbestos.                    ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
commonly referred to as complex and that need special or intense management by
the court.  (See reverse side of this form for a detailed explanation of special
management cases.)                    ( )

(f) Standard Management – Cases that do not fall into any one of the other tracks.           (X )

| | | |
|---|---|---|
| 9/9/2014 | Ari R. Karpf | Plaintiff |
| **Date** | **Attorney-at-law** | **Attorney for** |
| (215) 639-0801 | (215) 639-4970 | akarpf@karpf-law.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

**(Civ. 660) 10/02**

# UNITED STATES DISTRICT COURT

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA — DESIGNATION FORM** to be used by counsel to indicate the category of the case for the purpose of assignment to appropriate calendar.

Address of Plaintiff: _8 Hilltop Road, Plymouth Meeting, PA 19462_

Address of Defendant: _1001 Eagle Road, Wayne, PA 19087_

Place of Accident, Incident or Transaction: _Defendant's place of business_
*(Use Reverse Side For Additional Space)*

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or more of its stock?
(Attach two copies of the Disclosure Statement Form in accordance with Fed.R.Civ.P. 7.1(a))      Yes☐   No☒

Does this case involve multidistrict litigation possibilities?                                                     Yes☐   No☒
*RELATED CASE, IF ANY:*
Case Number: _____   Judge _____   Date Terminated: _____

Civil cases are deemed related when yes is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?
                                                                                           Yes☐   No☐

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?
                                                                                           Yes☐   No☐

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action in this court?                                                        Yes☐   No☐

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?
                                                                                           Yes☐   No☐

CIVIL: (Place ✔ in ONE CATEGORY ONLY)

A. *Federal Question Cases:*

1. ☐ Indemnity Contract, Marine Contract, and All Other Contracts
2. ☐ FELA
3. ☐ Jones Act-Personal Injury
4. ☐ Antitrust
5. ☐ Patent
6. ☐ Labor-Management Relations
7. ☒ Civil Rights
8. ☐ Habeas Corpus
9. ☐ Securities Act(s) Cases
10. ☐ Social Security Review Cases
11. ☐ All other Federal Question Cases
    (Please specify) _____

B. *Diversity Jurisdiction Cases:*

1. ☐ Insurance Contract and Other Contracts
2. ☐ Airplane Personal Injury
3. ☐ Assault, Defamation
4. ☐ Marine Personal Injury
5. ☐ Motor Vehicle Personal Injury
6. ☐ Other Personal Injury (Please specify)
7. ☐ Products Liability
8. ☐ Products Liability — Asbestos
9. ☐ All other Diversity Cases
    (Please specify) _____

## ARBITRATION CERTIFICATION
*(Check Appropriate Category)*

I, _Ari R. Karpf_____, counsel of record do hereby certify:
☐ Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;
☐ Relief other than monetary damages is sought.

DATE: _9/9/2014_____     _____     ARK2484
                         Attorney-at-Law        Attorney I.D.# 91538

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: _9/9/2014_____     _____     ARK2484
                         Attorney-at-Law        Attorney I.D.# 91538

CIV. 609 (5/2012)

JS 44 (Rev. 12/12)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

DIMARCELLA, DANIEL

**(b)** County of Residence of First Listed Plaintiff   Montgomery
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Karpf, Karpf & Cerutti, PC, 3331 Street Road, Two Greenwood Square, Suite 128, Bensalem, PA 19020, (215) 639-0801, akarpf@karpf-law.com

## DEFENDANTS

VALLEY FORGE MILITARY ACADEMY

County of Residence of First Listed Defendant   Delaware
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ❏ 1  U.S. Government Plaintiff
- ❏ 2  U.S. Government Defendant
- ☒ 3  Federal Question *(U.S. Government Not a Party)*
- ❏ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ❏ 1 | ❏ 1 | Incorporated or Principal Place of Business In This State | ❏ 4 | ❏ 4 |
| Citizen of Another State | ❏ 2 | ❏ 2 | Incorporated *and* Principal Place of Business In Another State | ❏ 5 | ❏ 5 |
| Citizen or Subject of a Foreign Country | ❏ 3 | ❏ 3 | Foreign Nation | ❏ 6 | ❏ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ❏ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ❏ 625 Drug Related Seizure of Property 21 USC 881 | ❏ 422 Appeal 28 USC 158 | ❏ 375 False Claims Act |
| ❏ 120 Marine | ❏ 310 Airplane | ❏ 365 Personal Injury - Product Liability | ❏ 690 Other | ❏ 423 Withdrawal 28 USC 157 | ❏ 400 State Reapportionment |
| ❏ 130 Miller Act | ❏ 315 Airplane Product Liability | ❏ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | ❏ 410 Antitrust |
| ❏ 140 Negotiable Instrument | ❏ 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | ❏ 430 Banks and Banking |
| ❏ 150 Recovery of Overpayment & Enforcement of Judgment | ❏ 330 Federal Employers' Liability | ❏ 368 Asbestos Personal Injury Product Liability | | ❏ 820 Copyrights | ❏ 450 Commerce |
| ❏ 151 Medicare Act | ❏ 340 Marine | **PERSONAL PROPERTY** | **LABOR** | ❏ 830 Patent | ❏ 460 Deportation |
| ❏ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ❏ 345 Marine Product Liability | ❏ 370 Other Fraud | ❏ 710 Fair Labor Standards Act | ❏ 840 Trademark | ❏ 470 Racketeer Influenced and Corrupt Organizations |
| ❏ 153 Recovery of Overpayment of Veteran's Benefits | ❏ 350 Motor Vehicle | ❏ 371 Truth in Lending | ❏ 720 Labor/Management Relations | **SOCIAL SECURITY** | ❏ 480 Consumer Credit |
| ❏ 160 Stockholders' Suits | ❏ 355 Motor Vehicle Product Liability | ❏ 380 Other Personal Property Damage | ❏ 740 Railway Labor Act | ❏ 861 HIA (1395ff) | ❏ 490 Cable/Sat TV |
| ❏ 190 Other Contract | ❏ 360 Other Personal Injury | ❏ 385 Property Damage Product Liability | ❏ 751 Family and Medical Leave Act | ❏ 862 Black Lung (923) | ❏ 850 Securities/Commodities/ Exchange |
| ❏ 195 Contract Product Liability | ❏ 362 Personal Injury - Medical Malpractice | | ❏ 790 Other Labor Litigation | ❏ 863 DIWC/DIWW (405(g)) | ❏ 890 Other Statutory Actions |
| ❏ 196 Franchise | | | ❏ 791 Employee Retirement Income Security Act | ❏ 864 SSID Title XVI | ❏ 891 Agricultural Acts |
| | | | | ❏ 865 RSI (405(g)) | ❏ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | | ❏ 895 Freedom of Information Act |
| ❏ 210 Land Condemnation | ❏ 440 Other Civil Rights | **Habeas Corpus:** | | **FEDERAL TAX SUITS** | ❏ 896 Arbitration |
| ❏ 220 Foreclosure | ❏ 441 Voting | ❏ 463 Alien Detainee | | ❏ 870 Taxes (U.S. Plaintiff or Defendant) | ❏ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ❏ 230 Rent Lease & Ejectment | 442 Employment | ❏ 510 Motions to Vacate Sentence | | ❏ 871 IRS—Third Party 26 USC 7609 | ❏ 950 Constitutionality of State Statutes |
| ❏ 240 Torts to Land | ❏ 443 Housing/ Accommodations | ❏ 530 General | | | |
| ❏ 245 Tort Product Liability | ☒ 445 Amer. w/Disabilities - Employment | ❏ 535 Death Penalty | **IMMIGRATION** | | |
| ❏ 290 All Other Real Property | ❏ 446 Amer. w/Disabilities - Other | **Other:** | ❏ 462 Naturalization Application | | |
| | ❏ 448 Education | ❏ 540 Mandamus & Other | ❏ 465 Other Immigration Actions | | |
| | | ❏ 550 Civil Rights | | | |
| | | ❏ 555 Prison Condition | | | |
| | | ❏ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ❏ 2 Removed from State Court
- ❏ 3 Remanded from Appellate Court
- ❏ 4 Reinstated or Reopened
- ❏ 5 Transferred from Another District *(specify)*
- ❏ 6 Multidistrict Litigation

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Americans w/Disabilities Act "ADA" 42 USC 12101

Brief description of cause:
Violations of the ADA and the Pennsylvania Human Relations Act "PHRA"

## VII. REQUESTED IN COMPLAINT:

❏ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ❏ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*   JUDGE _____   DOCKET NUMBER _____

DATE   9/9/2014

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____